**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-6412**

CHARLES F. PLYMAIL,

Petitioner - Appellant,

v.

PATRICK MIRANDY,

Respondent - Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.  Robert C. Chambers, District Judge.  (3:14-cv-06201)

Argued:  May 5, 2021                                    Decided:  August 10, 2021
Amended:  September 7, 2021

Before NIEMEYER, WYNN, and RICHARDSON, Circuit Judges.

Reversed by published opinion.  Judge Richardson wrote the majority opinion, in which Judge Niemeyer and Judge Wynn joined.

**ARGUED:**  Mackenzie Herman, Henna Shah, John J. Korzen, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant. Thomas T. Lampman, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellee.  **ON BRIEF:**  Mary Jasperse, Third-Year Law Student, Kristen R. Kovach, Third-Year Law Student, Appellate Advocacy Clinic, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant.  Patrick Morrisey, Attorney General, Lindsay S. See, Solicitor General, Jessica A. Lee, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellee.

RICHARDSON, Circuit Judge:

Charles Plymail was convicted of sexual assault in 1993. The details of his conviction are disturbing. What is also disturbing is how long it took for him to receive a decision on his direct appeal: over twenty years. Plymail eventually filed a habeas petition in the district court asserting that his incarceration was unconstitutional for three reasons: (1) the delay of his appeal, (2) comments made by the trial judge that coerced the jury into rendering a verdict, and (3) improper statements made by the prosecutor during closing argument. The district court rejected his claims. But we find Plymail is entitled to habeas relief based on the prosecutor's improper statements. Since the State did not argue below that the claim had been procedurally defaulted in state court, we review the claim de novo and find the prosecutor's statements exhorting the jury to protect women and send a message to the community and to "sadomasochistic" persons rendered the trial so fundamentally unfair as to deny Plymail due process of law. So we reverse.

I.      **Background**

A.      **The trial**

Plymail was indicted on one count of second-degree sexual assault, one count of burglary, two counts of first-degree sexual assault, one count of first-degree sexual abuse, and one count of malicious wounding. But these charges arose from separate allegations of criminal conduct. The State proceeded to trial on only the second-degree-sexual-assault charge involving Kathy Young. That trial turned on Plymail and Young's dueling accounts of their encounter.

Both sides agreed on some basic facts. In September 1992, Young met Plymail at a bar and offered him a ride back to his apartment. Once there, they had consensual sex twice. It is at this point that their stories diverge.

Young testified at trial that her consent ended when she said she was going home but Plymail insisted that she stay. According to Young, Plymail became aggressive and started to scare her, even slapping her with enough force to turn her head. Young claims that Plymail forced her to perform oral sex, forced her into the bedroom, and started touching her all over. When Plymail began to move into a position to force her to again perform oral sex, Young kicked him and "started running [and] started yelling for help." J.A. 1719. Once Young broke free and escaped Plymail's apartment, a neighbor heard Young's screams, let her into her apartment, wrapped her in a sheet, and called 911.

The neighbor testified about hearing noises in the apartment above her and observing Young's emotional state. The neighbor said that she heard Plymail explicitly shouting for Young to get her clothes. After law enforcement arrived, Young went to the hospital and was treated for minor contusions. Through the cross-examination of the State's witnesses, Plymail focused on inconsistencies in Young's testimony, her refusal of a rape kit at the hospital, and on details from the neighbor's testimony that were not in the written statement she gave to law enforcement.

Plymail's story notably diverged from Young's. According to Plymail, Young bit him while they were having consensual sex. As a result, Plymail slapped her, which caused her to leave angrily. Plymail recounted this to Officer Ball after he waived his *Miranda* rights and showed Ball "a red mark" consistent with a bite mark on his chest. J.A. 1861.

3

A different neighbor also testified that he overheard a man that night shouting, "Get back in here and get your clothes on" or "Get out of here—get your clothes on and get out of here." J.A. 1834. Plymail also called the emergency room doctor who examined Young to testify about his observations of Young's injuries and demeanor. After presenting their dueling narratives, the parties rested and closing arguments began.

The prosecution's initial closing argument focused on the evidence, burden of proof, and credibility of the witnesses. And Plymail does not argue that this initial closing was problematic. Defense counsel's closing argument, however, discussed the parade of alleged societal ills that would result from a guilty verdict. Defense counsel discussed the difficulty of disproving rape charges: "A rape charge is very easy to make but it is the most difficult to defend against." J.A. 1959. After focusing on how easy it was for an "angry, offensive" woman to harm "innocent . . . males," defense counsel warned the men in the jury: "This is dangerous, Gentleman. . . . it's dangerous to even look at a woman today because she can shout 'Rape' under any condition . . . and you have to disprove it and it's tough because there are only two people there and society tends to believe the woman." J.A. 1972.

Rather than object to the defense argument, the prosecutor used his twelve minutes of rebuttal to counter counsel's moral shaming with his own. The prosecutor warned the jury of the existence of "trickster lovers" who disguise themselves to "your sons and daughters" as well-intentioned individuals, but have a "sweet tooth . . . for masochistic, sadomasochistic horror." J.A. 1975. And it is these "trickster lovers," the prosecutor explained, that would be sent a message from the jury's verdict. That message would either

4

be that the community would not condone such behavior or that the "sadomasochistic" persons are free to do as they please. The prosecutor then left the jury with a final thought: "[t]hink of the community" and deliver a verdict "for womankind, for all of us." J.A. 1981.

After deliberating for two-and-a-half hours, the jury sent a note revealing that it was deadlocked. This deadlock created concerns as the trial judge had repeatedly emphasized that the trial was on a tight schedule, needing to conclude within two days. The judge brought the jury out, and the foreperson informed the judge that the jury had not reached a unanimous verdict. The judge then asked the foreperson what the numerical vote was, without informing him of which way the vote was going. The foreperson responded "six-four-two." J.A. 1987. The judge then asked the jury if further deliberations would be helpful, to which three jurors said it would. The judge then instructed the jury to go back into the jury room and discuss whether they believed further deliberations would help them reach a verdict.

About forty minutes after the judge sent the jury back to the jury room, they returned a guilty verdict.

**B.    Direct appeal**

Plymail filed a notice of intent to appeal in March 1994. What followed was an ordeal spanning over 20 years, six lawyers, and multiple state courts. Many delays stemmed from disagreements with the attorneys, difficulty contacting them, various courts taking too long to rule on simple motions, and Plymail's battle with ulcerative colitis.

Soon after noticing his appeal, Plymail had trouble contacting his first appointed counsel. So he filed a pro se motion seeking to dismiss her and to extend the time to file

5

an appeal. When the trial court did not rule on Plymail's motions, Plymail sought a writ of mandamus to compel a ruling. The West Virginia Supreme Court of Appeals granted mandamus relief and Plymail was assigned a public defender as his second lawyer. Plymail's first counsel was issued a public admonishment by the Disciplinary Board for her representation of Plymail.

Plymail was then given an extension of time to file his appeal, but he was apparently never made aware of the extension. All communication with his assigned public defender stopped. Years later, Plymail learned that his assigned public defender left the office in 1997. And by 2002, Plymail began suffering from nonresponsive ulcerative colitis, which led to several long hospital stays. Plymail became depressed and ultimately "gave up [his] long and frustrating fight against the system." J.A. 30. But in 2008, Plymail made one last effort to appeal his conviction.

After having his assigned public defender (who was no longer a public defender) removed, Plymail went through several more attorneys due to the attorneys' lack of contact, scheduling issues, and his battle with ulcerative colitis. Finally, in 2014 (twenty years after his conviction), Plymail's *sixth* appointed lawyer filed an opening brief. Unsatisfied with that opening brief, Plymail filed his own pro se reply brief.

With his appeal finally before the West Virginia Supreme Court of Appeals, the court affirmed Plymail's convictions in 2015. The court first rejected Plymail's argument that the undue delay in adjudicating his appeal required overturning his conviction. The court found that some of the delay was attributable to Plymail's "accusatory, abrasive, and belligerent attitude" and to Plymail's illness, which rendered him unavailable for several

6

years. J.A. 923–24. The court also found that the delay did not prejudice him because his appeal lacked merit.

The court next rejected Plymail's argument that the trial court coerced the jury into reaching a verdict. Recognizing that the trial court made several comments about the timing of the trial, the court determined that the trial court's statements about its desire to finish the trial in two days were conversational and polite. So it found the comments did not coerce the jury. The court then found that the trial court's instructions to the deadlocked jury were not objected to, waiving any claim about their coercive effect. And the court held that the waived instructional claim did not amount to plain error as it created no miscarriage of justice.

Finally, the court found Plymail waived his claim about the prosecutor's closing argument. The court noted that the State "dispute[d] that the prosecutor's comments amounted to plain error as these comments did not cause a 'miscarriage of justice' and further did not seriously affect the fairness, integrity, or public reputation of petitioner's trial." J.A. 930. But after noting that argument, the court made no conclusion about whether the plain-error standard of review was satisfied.

## C. Federal habeas proceedings

Plymail petitioned the district court for habeas relief under § 2254 in January 2014. Relevant now, he sought relief based on the appellate delay, judicial coercion, and the prosecutor's improper comments. After this petition spent several more years passing back and forth between the district court and the Fourth Circuit, Plymail filed a partial motion for summary judgment on his claim that the delay in adjudicating his direct appeal violated

7

his due process rights. The State cross-moved for summary judgment on all of Plymail's claims. The district court granted the State's motion for summary judgment and dismissed Plymail's petition. Plymail timely appealed and we have jurisdiction. *See* 28 U.S.C. § 1291; 28 U.S.C. § 2253.

## II.    Discussion

### A.    Jurisdiction

Before addressing the merits, we must address our jurisdiction to consider Plymail's petition. At oral arguments, the parties informed this Court that Plymail is no longer incarcerated for the sexual-assault charge that forms the basis of his current habeas petition. It appears that he was released from incarceration on that charge but may face a separate set of charges.[1]

We consider whether we have jurisdiction under 28 U.S.C. § 2254 and then separately whether the case has become moot. *See Carafas v. LaVallee*, 391 U.S. 234, 237–39 (1968). Looking first to § 2254(a), we may only "entertain an application for a writ of habeas corpus in behalf of a person *in custody* pursuant to the judgment of a State court only on the ground that he is *in custody* in violation of the Constitution or laws or

---

[1] We are confounded by significant uncertainty about Plymail's actual status. Before oral argument, the record suggested Plymail remained incarcerated on this charge. During argument, Plymail's counsel stated that Plymail was no longer incarcerated on this charge but remained in some form of detention on separate charges. After argument, counsel claimed by letter to have misspoken at oral argument and suggested Plymail was "on parole for the conviction at issue." But in doing so, counsel did not address whether Plymail remained in some form of detention for any other reason. After the panel opinion was issued, Plymail's counsel reiterated that Plymail was on parole and claimed that Plymail was "not incarcerated in connection with any other offense."

treaties of the United States." 28 U.S.C. § 2254(a) (emphases added). A reasonable reader might think we lack jurisdiction over a habeas petition when the petitioner is unconditionally released from custody. But we generally consider whether jurisdiction exists at the time an action is filed. So "once the federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to completion of proceedings on such application." *Carafas*, 391 U.S. at 238. Thus, because Plymail was "in custody" when he petitioned for habeas relief, we are not relieved of jurisdiction under § 2254 because of his subsequent release from prison.

Having found that the district court had jurisdiction when the petition was filed, we turn to whether Plymail's release renders the case moot. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). Because habeas corpus proceedings challenge a prisoner's *detention*, a logical assumption is that the release of a prisoner from detention renders a habeas petition moot. *See Lawrence v. Branker*, 517 F.3d 700, 717 (4th Cir. 2008) (petitioners may obtain habeas relief only when they are "in custody in violation of the Constitution or laws or treaties of the United States") (quoting 28 U.S.C.A. § 2254(a)).

But the Supreme Court has instructed otherwise. The existence of certain "collateral consequences" to the petitioner's conviction prevents a habeas petition from becoming moot. *Carafas*, 391 U.S. at 237–38. The mere "possibility of consequences collateral to the imposition of sentence is sufficiently substantial to justify our dealing with the merits."

9

*Pollard v. United States*, 352 U.S. 354, 358 (1957).  And the Court presumes that collateral consequences exist.  *See Sibron v. State of N.Y.*¸ 392 U.S. 40, 55 (1968).  As we stand today, "the possibility that the conviction would be used to impeach testimony [a petitioner] might give in a future proceeding and the possibility that it would be used to subject him to persistent felony offender prosecution if he should go to trial on any other felony charges in the future" defeat mootness.  *Evitts v. Lucey*, 469 U.S. 387, 391 n.4 (1985).  And restrictions imposed by the terms of parole may also suffice. *Spencer v. Kemna*, 532 U.S. 1, 7 (1998) (noting that the institution of parole "constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction").  So at least based on the meager information we now have on appeal, Plymail appears to be on parole and may face prosecution for a different crime.  So despite some criticism of this approach, *see Spencer*, 523 U.S. at 8–12, we can only conclude that this case is not moot.

**B.    Prosecutor's closing argument**

Plymail argues that the prosecutor's closing statement violated due process and that this Court should review this claim de novo, that is, without the normal deference we give state-court judgments under § 2254.  Finding de novo review appropriate, we reverse.

**1.    Standard of review**

Our standard of review is often critical in habeas cases brought by state-court prisoners.  This case is no exception.

We begin with the typical standards by which federal courts review a state-court prisoner's habeas claims.  "[H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through

10

appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). A federal court therefore "may grant a writ of habeas corpus only if the state court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Winston v. Kelly*, 592 F.3d 535, 543–44 (4th Cir. 2010) (quoting 28 U.S.C. § 2254(d)).[2]

Those typical standards, however, have exceptions. One is when a state court does not adjudicate the merits of a claim properly before it. Federal courts "bypass § 2254(d)'s limitations on relief when a state court has refused to 'adjudicate' a procedurally proper claim 'on the merits.'" *Valentino v. Clarke*, 972 F.3d 560, 576 (4th Cir. 2020) (quoting § 2254(d)). In such a case, a federal court reviews the claim de novo. *See Gordon*, 780 F.3d at 202.

But to review this claim de novo, the state court must have failed to review a claim that was properly before it. Because when the state court finds a claim procedurally defaulted, we will not review its merits under any standard unless the petitioner establishes both cause for the default and prejudice. S*ee Martinez v. Ryan*, 566 U.S. 1, 9 (2012). Nor do we second-guess the state court's application of its own procedural rules, absent an extraordinary case involving a fundamental miscarriage of justice. *See Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010). But this rule limiting our review of procedurally defaulted claims "is not a jurisdictional one." *Yeatts v. Angelone*, 166 F.3d 255, 260–61 (4th Cir.

---

[2] On appeal, we review a district court's dismissal of a habeas petition de novo. *Gordon v. Braxton*, 780 F.3d 196, 200 (4th Cir. 2015).

1999); *see also Royal v. Taylor*, 188 F.3d 239, 247 (4th Cir. 1999) ("Procedural default must be pled as an affirmative defense and the Commonwealth is 'obligated to raise procedural default as a defense, or [it will] lose the right to assert the defense thereafter.'" (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996))). So when the State fails to assert procedural default as a defense, it waives that argument, and we must consider the petitioner's unexhausted claim de novo. *See* 28 U.S.C. § 2254(d) (deference applies only to cases decided on the merits); *see also Gordon*, 780 F.3d at 202; *Wright v. Angelone*, 151 F.3d 151, 156–57 (4th Cir. 1998).

Here, the West Virginia Supreme Court of Appeals did not adjudicate Plymail's prosecutorial misconduct claim on the merits. Instead, it held that the claim had been waived because Plymail failed to object to the prosecutor's comments at trial. And while the court noted the State argued that plain error did not apply, the court made no finding on that claim. *Cf. Daniels v. Lee*, 316 F.3d 477, 487 & n.8 (4th Cir. 2003). So this is a clear case of procedural default.

Ordinarily, that would be the beginning of the end of the petitioner's case. If the State then relied on the procedural default before the district court, the habeas petition would be dismissed. But here the State did not raise the procedural default in front of the district court.[3] The State merely noted that the West Virginia Supreme Court of Appeals found Plymail waived the prosecutorial misconduct claim. Lacking from the State's

---

[3] We need not decide whether this was a mistake or an exercise of executive discretion to permit consideration of this claim.

12

argument was any suggestion that the district court was therefore barred from considering the claim.

Had the State argued procedural default before the district court, we would be barred from considering the merits of this claim. *See Martinez*, 566 U.S. at 9. And had the West Virginia Supreme Court of Appeals resolved this claim on the merits, we would have to review this claim under the deferential § 2254(d) standard of review. *See Winston*, 592 F.3d at 543–44. But neither occurred here. So we review Plymail's claim de novo, asking only if there was constitutional error. *See Hudson v. Hunt*, 235 F.3d 892, 895 (4th Cir. 2000).[4]

### 2. Merits

Consistent with the great power they possess, we expect prosecutors to wield their authority in accordance with our finest values and traditions. *See In re Stevens*, 956 F.3d 229, 234 (4th Cir. 2020). But when we review the actions of state prosecutors, the scope of our review is narrow, as we lack any broad supervisory power. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974). We may only consider whether the state prosecutor has committed a due process violation. *Id*. And so we may grant relief here only if the prosecutor's remarks were so improper as to deny Plymail a fundamentally fair trial. *Id.* at 645. Clearing this high bar requires two findings: first, that the remarks were plainly improper, and second, that the remarks so prejudiced Plymail's substantial rights

---

[4] While we may raise procedural default on our own where "overriding interests of comity and judicial efficiency [] transcend the interests of the parties," *Yeatts*, 166 F.3d at 261, we decline to do so here.

13

that he was denied a fair trial. *United States v. Saint Louis*, 889 F.3d 145, 156 (4th Cir. 2018); *see also id*. at 642–43, 645; *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

As to whether the rebuttal argument was improper, prosecutors must seek convictions based on the evidence as it applies to the elements of the offense. While we do not expect emotionless prosecutors to present antiseptic arguments, they may not seek a conviction based on prejudice or passions.

Prosecutors violate this edict when they stray beyond the defendant's crimes and ask the jury to convict in order to "send a message to the community." *United States v. Runyon*, 707 F.3d 475, 514 (4th Cir. 2013); *see also United States v. Pupo*, 841 F.2d 1235, 1240 (4th Cir. 1988) (en banc). Such exhortations improperly invite the jury to focus on a larger social objective beyond the defendant and his crimes. *Runyon*, 707 F.3d at 514–15; *Pupo*, 841 F.2d at 1240; *see also United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984) ("A prosecutor may not urge jurors to convict a criminal defendant in order to . . . deter future lawbreaking. . . . The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear."). So too do prosecutors step over the line when they ask jurors to place themselves in the victim's shoes. *See United States v. Hall*, 979 F.3d 1107, 1119 (6th Cir. 2020); *Gov't of the Virgin Is. v. Mills*, 821 F.3d 448, 458 (3d Cir. 2016); *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2007).

Even so, "[i]solated passages of a prosecutor's argument" often fail to violate due process. *See Donnelly*, 416 U.S. at 646. But the prosecutor here focused the rebuttal argument on sending a message to the community and protecting the jurors' own children from sexual assault.

14

After claiming the presumption of innocence had been "ripped" from Plymail and disparaging the defense attorney, the prosecutor explained that the jury was in "an era of modern women." J.A. 1974–75. And while the prosecutor claimed "not [to] be in this era," he said this era involved "single women" who "go out to bars and cafes and meet men." *Id.* Then the prosecutor tied this era to the jury's own sons and daughters. He asked the jury to imagine that their children will go off to Marshall and to other universities and "they will go to bars and cafes and groupings and they will meet men." *Id.* Men, the prosecutor continued, they think are "nice" and "soft" and "sweet" but who are really "trickster lovers." *Id.* And the prosecutor revealed how "privileged" he was to "bring this to the attention of the community to protect, to protect our sons and our children and the single women and the adult women and the modern women." *Id.*

Having laid out a powerful and objectionable exhortation, the prosecutor continued: "This sweet tooth of his for masochistic, sadomasochistic horror cannot be allowed to escape." *Id.* He then responded to the defense counsel's own objectionable closing-argument claim that rape cases were easy to bring. Based on outside-the-record "statistics," the prosecutor claimed that "seventy percent of rapes go free" without charges. J.A. 1976. Rape charges, he claimed, were "not easy to make" because the victim has to testify in public with all its burdens while "all the rights go to the defendant." *Id.*

Only then did the prosecutor turn to providing reasons to believe the victim's testimony: the oath she took in court, the consistency of her statements, the lack of a motive to put herself through the ordeal, no evidence of animosity, and so on. Though he describes himself as a "dispassionate prosecuting attorney," he then claims to be "emotionally upset"

15

that Plymail would make up a story about the victim biting him.  J.A. 1977.  And he again returned to broader, societal themes:  "[D]oesn't a woman have a right at some point in her life to control her body when she's with a man?"  J.A. 1978.  To respond to this inappropriate rhetorical question, the prosecutor expounded on the West Virginia spousal law that gives a wife the right to refuse sex.

Even then, the prosecutor was not done with the broader societal message that he felt must be sent in this "crucial case, very important case for the people, for yourselves, for the community."  J.A. 1979.  The jury would, he again emphasized, "be sending a message" with its verdict.  *Id.*  And the jury "must think about the message."  *Id.*  If their verdict was not guilty, they would "send a message so loud and clear to men on dates who have the tendency of the sweet tooth of sadomasochism to say, 'I have got you now.'"  J.A. 1981.  He then closed, staying on message:  the jury's verdict should be "guilty . . . for all of us, for womankind, for all of us."  *Id.*

Reviewing this closing, even twenty-five years later and on the cold record, leaves us with no doubt of its power.  Who is against "womankind"?  Who seeks to grant a license to those with "the sweet tooth of sadomasochism" to have their way with our daughters as they enter college?  Who wishes to send a message to the community that men may have their way with women, that rapists may go free, that women will not be protected?

For the same reason it was powerful, it was highly improper.  These appeals to the jury violated the fundamental fairness due to every criminal defendant.  A criminal trial is about the evidence of the defendant's actions.  Not all of womankind.  Not a license for

16

our own daughters to be abused by those with "the sweet tooth of sadomasochism." Not societal messages of any sort.

But even plainly improper statements fail to establish a due process violation unless they so prejudiced Plymail's substantial rights such that he was denied a fair trial. *Darden*, 477 U.S. at 181.[5]

The palpable power of these statements before a jury goes a long way to show this prejudice. The prosecutor asked the jury to ignore its fundamental role: determining the defendant's guilt based solely on the evidence and applicable rules of law. *United States v. Fisher*, 10 F.3d 115, 121 (3d Cir. 1993). These comments repeatedly asked the jury to discard the tools given by the court and instead convict based on the prospective sins of others.

And beyond the power of the statements themselves, the prosecutor's exhortations took on particular import in this case, where only limited evidence existed. As date-rape cases often are, this was a he-said-she-said case, a battle of credibility between the accuser and the accused. *See* Katherine K. Baker, *Sex, Rape, and Shame*, 79 BOS. UNIV. L.J. 663, 690 (1999) ("Unlike stranger rapes, date rape trials are nothing but credibility contests.

---

[5] We sometimes refer to an array of factors to help identify when a prosecutor's remarks violated due process. *See United States v. Wilson*, 135 F.3d 291, 299 (4th Cir. 1998) ("'(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; [] (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters' . . . (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel . . . and (6) whether curative instructions were given to the jury" (quoting *United States v. Adam*, 70 F.3d 776, 780 (4th Cir. 1995))).

There is no fruit of the crime to be produced, no weapon to be traced and no mistaken identity. Everyone concedes that both parties were there, that there was no weapon and that intercourse did take place. The only question is whether she consented. . . . Given how easily the sexual acts could be consensual in these cases, it is very hard for the prosecution to remove all reasonable doubt that they were not."). But this case was even closer, as everyone agreed consensual sex occurred before the assault. There was no forensic evidence, no physical evidence, and no eyewitness testimony. So it was no surprise that the jury reported after some deliberation that they could not reach a unanimous verdict. Only after the court encouraged further deliberations did the jury reach a unanimous verdict.[6]

The State seeks to overcome the prejudice of these statements by claiming the prosecutor was merely responding to the improper arguments made by defense counsel. Defense counsel too must "confine arguments to the jury within proper bounds." *United States v. Young*, 470 U.S. 1, 8 (1985). And defense counsel undoubtably violated his professional obligations in warning jurors of the danger men face from fabricated rape accusations. *See* J.A. 1959 (stating innocent men can be imprisoned for the rest of their lives by angry women seeking revenge for a man's innocent actions); J.A. 1972 (noting the

---

[6] And even this unanimous verdict is the subject of criticism as Plymail argues that the trial judge coerced the jury into rendering a verdict by continually pressuring the jury to reach a verdict in two days, *see* J.A. 1604–05, 1631, 1759, 1797, 1810, 1885–86, and by giving a coercive jury charge, J.A. 1988–89. We need not independently address this claim, noting only that the jury's hesitation to convict Plymail reflects the strength of the State's case.

dangers of even looking at women because they can shout rape for a mere passing glance and society tends to believe the accusations of women).

But two wrongs do not make a right. Defense counsel's misconduct does not grant the prosecutor a "license to make otherwise improper arguments." *Young*, 470 U.S. at 12. A prosecutor must object to improper arguments, not merely respond in kind. *Id.* But we do consider the context of the prosecutor's misconduct in evaluating its prejudice against the defendant. *See id.* (stating that because "the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly . . . the defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant" to finding prejudice). So in weighing "the impact of the prosecutor's remarks," we "must also take into account defense counsel's opening salvo." *Id.*

Even considering defense counsel's improper argument, however, the prosecutor overreached. The prosecutor went well beyond any reasonable attempt to "right the scale" that defense counsel's comments improperly tipped. *Id.* This prosecutor's plea to convict based on considerations extraneous to the evidence was neither responsive nor proportional to the defense counsel's comments.

Given the evidence presented, the prosecutor's powerful, extensive, and plainly improper statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.[7]

---

[7] Plymail separately claims the twenty-year delay on direct appeal violated his right to due process and warrants habeas relief. But the only means for a habeas petitioner to obtain relief from a state court judgment is a finding that the petitioner "is in custody in (Continued)

*          *          *

"Court proceedings are held for the solemn purpose of endeavoring to ascertain the truth which is the sine qua non of a fair trial. Over the centuries Anglo-American courts have devised careful safeguards by rule and otherwise to protect and facilitate the performance of this high function." *Estes v. State of Tex.*, 381 U.S. 532, 540 (1965). The prosecutor's comments cut against this very purpose, fixating the jury on matters extraneous to the truth of this case, and "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. We thus find the district court erred in granting summary judgment on Plymail's claim that improper statements made by the prosecutor during closing argument violated his right to due process.

REVERSED.

---

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petitioner, therefore, must be in custody (or subject to parole or other collateral consequences) "as a result of" the challenged state appellate court decision for habeas relief to be available. *Wright*, 151 F.3d at 159 (dismissing a petition for habeas relief which asserted that the state court denied petitioner equal protection because the petitioner was not "currently detained as a result of a decision of the" state court). As Plymail is otherwise entitled to relief, we need not comment on whether the delay *resulted in* his custody, parole, or collateral consequences (or when appellate delay might violate due process and prejudice the petitioner).